# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CEDAR CITY AMUSEMENTS, LLC d/b/a CUMBERLAND VALLEY SHOWS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:10-cv-392-TWP-TAB |
| BARTHOLOMEW COUNTY 4-H FAIR, INC., | ) ) ) | |
| Defendant. | ) | |

## ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on the parties' cross-motions for summary judgment. The present dispute stems from a contract to provide carnival entertainment at a county fair ("Contract"). Two parties entered the Contract: (1) Bartholomew County 4-H Fair ("Fair") and (2) Cedar City Amusements, LLC d/b/a Cumberland Valley Shows ("Show"). Each party alleges that the other breached the Contract. In the Court's view, only Show is able to prove a breach of the Contract as a matter of law. For the reasons set forth below, Show's Motion for Summary Judgment (Dkt. 49) is **GRANTED** and Fair's Motion for Summary Judgment (Dkt. 52) is **DENIED**.

## I. LEGAL STANDARD

It is not uncommon for a court to be confronted with cross-motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief. "In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment

1

standard." *Tippecanoe Associates, LLC v. OfficeMax North America, Inc.*, 2009 WL 798745, at *3 (S.D. Ind. March 20, 2009) (citation and internal quotations omitted).

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted).

In contract cases like this one, the Court's primary objective is to effectuate the intent of the parties at the time the contract was made, which is determined by examining the language the parties used to express their rights and duties. *Trustcorp Mortg. Co. v. Metro Mortg. Co.*, 867 N.E.2d 203, 212-13 (Ind. Ct. App. 2007). The Court must read the contract as a whole, construing language to give meaning to all of the contract's words, terms, and phrases. *Id.* at 213. Likewise, the Court must accept a contract interpretation that harmonizes provisions, not one that places provisions in conflict. *Id.* Finally, "[c]onstruction of a written contract is a question of law for which summary judgment is particularly appropriate." *Slutsky-Peltz*

*Plumbing & Heating Co., Inc. v. Vincennes Cmty. School Corp.*, 556 N.E.2d 344, 345 (Ind. Ct. App. 1990) (citation omitted).

## II. BACKGROUND

Fair is an Indiana corporation that sponsors an annual Bartholomew County fair, which, like any good fair, includes carnival entertainment. Show, a foreign limited liability corporation ("LLC") organized under the laws of the State of Tennessee, provides carnival entertainment. Show's sole member is Jeremy Floyd, a Tennessee citizen. On or about July 13, 2007, the parties entered the Contract, under which they agreed that Show would provide carnival entertainment services at the Bartholomew County fair for five years – from 2009 through 2013. Because fun-seeking fair-goers demand a wide variety of diversions, the Contract required Show to provide a minimum of 26 "ticket-taking attractions." Show also agreed to provide the requisite insurance coverage and to furnish all personnel necessary to operate all shows, attractions, and concessions. The after-tax money derived from the sale of tickets to the various attractions was divided between the parties, with Show receiving 75% and Fair receiving 25%.

On the surface, things went smoothly in 2009. Fair never notified Show of any perceived breaches, and Show's gross revenue from ticket sales was $194,129.00. During its 30(b)(6) deposition, Fair's designee testified as follows:

> Q: Sir, as you sit here today, do you have any evidence that [Show] breached the contract…?
> ….
> A: The way the contract is written, no.

(Fair 30(b)(6) Dep. at p. 31:21-32:3). Apparently, though, Fair was less than satisfied. On January 20, 2010, Fair attempted to terminate the Contract via letter, citing two specific grounds

for termination. First, "As you know, the rides and amusements of which you were to provide were continuously either inoperable or were closed down by the proper government officials." Second, "[Show] failed to comply with the laws of the State of Indiana by failing to pay, in a timely fashion, for services rendered to [Show] by vendors and citizens in Bartholomew County." The genesis of these allegations is unclear. For instance, in its 30(b)(6) deposition, Fair conceded that it did not have evidence that government officials shut down rides. (Fair 30(b)(6) Dep. at p. 48:20-49:10). Moreover, Fair admitted that the Contract did not govern Show's obligations to third-party vendors. (Fair 30(b)(6) Dep. at p. 53:20-24).

Soon after Fair's letter, Show fired back, stating that it "does not confirm acceptance of nor agree to termination of the Contract. And, [Show] states that the unilaterally proposed termination by [Fair] is unlawful and inequitable." Show also demanded "assurances from [Fair] that it will be allowed to perform under the Contract for the 2010 Bartholomew County Fair." Fair never responded.

In the meantime, Fair had found another suitor. In late December 2009 or early January 2010, Fair began negotiating a four-year exclusive agreement with Burton Brothers Amusement ("Burton"). Burton signed the agreement ("Burton Agreement") on January 18, 2010 – two days before Fair initially attempted to terminate its Contract with Show. The Burton Agreement was formally executed on January 29, 2010. Through its 30(b)(6) designee, Fair all but admitted that the Burton Agreement breached Show's right to exclusivity under the Contract. The following exchange is not only amusing, it is instructive:

> Q. As a common person, sir, you and I can agree that [Show] was given the exclusive right for the 2010 fair carnival under contract?
>
> A. I have no comment. No comment.
>
> Q. You're really – you're going to plead the Fifth?
>
> A. Fifth Amendment, by God.

(Fair 30(b)(6) Dep. at p. 60:2-8). Burton replaced Show for the 2010 fair and made $203,466.00 in gross revenues. Show claims that, as a result of its ouster, it suffered damages. After all, Burton received (and will continue to receive) Show's opportunity to profit from the fair from 2010 through 2013. Additional facts are added below as needed.

## III. DISCUSSION

Fair deploys numerous arguments in support of its theory that Show breached the Contract. Interestingly, Fair admits that it uncovered Show's alleged breaches through the discovery process in this case – long after it attempted to terminate the Contract. In any event, none of Fair's arguments carry the day. Each is addressed in turn below.

### A. Certificate of Authority

The Contract requires Show to comply with applicable laws. Specifically, Section 10 provides:

> **Compliance with Laws.** It is further agreed that Show in all respects comply with the laws in force at any time during the existence of this contract, and if anything required by this contract to be done shall be contrary to any law now in force or hereafter enacted, then this contract shall, as to those things, be void, and that if by reason of such law this contract cannot be legally performed, the parties shall not be bound by the terms hereof.

Fair argues that Show failed to comply with Indiana law because, as a foreign company, it did not obtain a certificate of authority from the Indiana Secretary of State, thus breaching the Contract. Indeed, a foreign LLC may not "transact business" in Indiana until it obtains a certificate of authority from the Secretary of State. IND CODE § 23-18-11-2(a). Further, Indiana

law provides that a foreign LLC that has failed to obtain a certificate of authority may not maintain a lawsuit in Indiana until it obtains a certificate of authority. *See* IND CODE § 23-18-11-3(a).[1] To bolster its position, Fair highlights that Show's rides are set up in Indiana, tickets for the rides are sold and purchased in Indiana, and Show temporarily employs some Indiana residents to work the Indiana fair.

While this argument has some appeal, the Court is not persuaded. IND CODE § 23-18-11-2(b) (11) exempts businesses whose activity in Indiana consists of "[t]ransacting business in interstate commerce." Moreover, "[i]t is incumbent upon the moving party to demonstrate that a foreign corporation's conduct falls outside the enumerated exclusions." *Lackmond v. Constructions Supply, Inc.*, 691 N.E.2d 494, 495 n. 2 (Ind. Ct. App. 1998). Here, Show – a Tennessee LLC whose sole member is a single Tennessee citizen – periodically transports mechanical rides and other amusement attractions for carnivals and fairs in Indiana, among other states. Show uses some of its permanent employees to set up, maintain, and take tickets for those rides. Show also temporarily employs people in the states where the carnivals and fairs occur. Significantly, Show does not have any permanent facilities or employees in Indiana. *See id.* at 495 ("the undisputed evidence shows that Lackmond does not operate any office or warehouse in Indiana or employ any Indiana residents"). The Court finds that Show's temporary presence in Indiana does not alter the fundamental interstate character of its business, which entails moving amusement attractions around the country. Thus, in light of the exemption for transacting

---

[1] However, it is worth noting that this statute does not apply in federal proceedings. *See Peter & Burghard Stone Co. v. Carper*, 172 N.E. 319, 325 (Ind. Ct. App. 1930) ("The general rule is that a statute which merely closes the courts of the state to a noncomplying foreign corporation doing business within the state, and which does not expressly or constructively declare the contract void, does not prevent the maintenance of an action by such foreign corporation in a federal court sitting in that state, upon a contract made within the state."). Moreover, by failing to plead this defense in its answer, Fair waived it. *Lackmond v. Constructions Supply, Inc.*, 691 N.E.2d 494, 495 (Ind. Ct. App. 1998).

business in interstate commerce, Show was not legally required to obtain a certificate of authority. In other words, Indiana's law relating to foreign corporations does not give Fair the ability to sidestep its contractual obligations.[2]

**B.   Necessary Approvals**

In a similar fashion, Fair argues that Show breached Section 10 of the Contract by failing to obtain necessary approvals and permits from the Indiana Department of Homeland Security in violation of IND CODE § 22-15-7-3. However, this argument is contradicted by Show's Application for Annual Permit to Operate Amusement Devices, made to the Indiana Department of Homeland Security on June 8, 2009.

Fair argues that the application is deficient because it uses the name "Cumberland Valley Shows" – Show's "doing business as" moniker – instead of "Cedar City Amusements, LLC" In effect, Fair invites the Court to elevate form over substance. However, even assuming that Show did not properly file a certificate stating that it was operating under the name "Cumberland Valley Shows" pursuant to IND CODE § 23-15-1-1, this is a non-issue. Indiana courts have repeatedly held that a corporation's failure to comply with this statute does not invalidate contracts entered into by that corporation. *See, e.g., Parker v. Rod Johnson Farm Service, Inc.*, 384 N.E.2d 1129, 1131 (Ind. Ct. App. 1979).

Here, Fair was not confused about the identity of the other party to the Contract. Show customarily does business using the name Cumberland Valley Shows, as evidenced by the Contract itself. Moreover, the application for permits was signed by Jeremy Floyd (Show's sole member) and listed the address of Show's principal place of business. Show obtained all

---

[2] Interestingly, Fair's 30(b)(6) designee was asked point-blank, "Did Show violate paragraph 10?" The designee responded, "No." (Fair 30(b)(6) Dep. at pg. 31:15-16).

7

necessary permits for 2009, an inspector with the Department of Homeland Security inspected the rides that year while they were operating, the inspector issued permits for them, and those permits were affixed to the actual rides. Additionally, Show maintained a commercial general liability insurance policy covering each of the permitted rides throughout Show's performance under the Contract, and filed certificates of liability insurance with the Department of Homeland Security under the name Cedar City Amusements, LLC, listing the same address listed on the application for permits. Simply stated, the monikers that Show used are immaterial, given that it obtained the requisite insurance and permits.

**C.   Cumberland Valley Shows, Inc.**

Section 12 of the Contract provides, "[i]f for any reason Cumberland Valley Shows ceases to operate this contract becomes void and Fair is open to negotiate freely with other parties." Fair contends that Section 12 is a reference to "Cumberland Valley Shows, Inc.," a company formerly operated by Jeremy Floyd's grandfather, J.D. Floyd. Larry Fisher ("Fisher"), President of Fair's Board and its 30(b)(6) designee, stated through an affidavit that Fair trusted J.D. Floyd and that he "was available…to cure any problems that might arise which…Fair believed could not be resolved directly with Jeremy Floyd." Therefore, when J.D. Floyd's company, Cumberland Valley Shows, Inc., ceased operating, Fair argues, this armed it with grounds to terminate the Contract.

The Court is not persuaded. In particular, Fisher's affidavit conflicts with the plain language of the Contract. Specifically, the very top of the Contract lists the parties as (1) BARTHOLOMEW COUNTY 4-H FAIR, INC. and (2) CEDAR CITY AMUSEMENTS <u>DBA CUMBERLAND VALLEY SHOWS</u> (emphasis added). Moreover, in the signature block, Jeremy Floyd signed under the notation "<u>Cumberland Valley Shows</u>." (emphasis added).

Obviously, pursuant to the Contract, the monikers Cedar City Amusements and Cumberland Valley Shows are interchangeable and denote the exact same entity. Tellingly, the entity "Cumberland Valley Shows, Inc." is nowhere to be found in the Contract. *See First Federal Sav. Bank of Indiana v. Key Markets, Inc.*, 559 N.E.2d 600, 604 (Ind. 1990) ("When a court finds a contract to be clear in its terms and the intentions of the parties apparent, the court will require the parties to perform consistently with the bargain they made").

Perhaps equally telling, during Fisher's 30(b)(6) deposition, he conceded that Fair contracted with Jeremy Floyd's company, Cedar City Amusements, LLC d/b/a Cumberland Valley Shows. Moreover, as previously mentioned, he could not identify a provision of the Contract that Show breached. Thus, Fisher's unexpected and sudden realization set forth in his affidavit is insufficient to create an issue of fact. "[A] party cannot create an issue of fact by submitting an affidavit whose conclusions contradict prior testimony." *Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719, 724 (7th Cir. 1998). Ultimately, the Court finds that Fair's argument related to Cumberland Valley Shows, *Inc*. is unpersuasive.

**D.     Fair's Counterclaim**

Next, Fair argues that Show breached Section 6 of the Contract, which required Show and Fair to divide the after-tax money derived from ticket sales 75/25. Fair argues that Show distributed the money improperly. Fair's far-fetched theory is that Show calculated the amount owed to Fair by weighing the used tickets, not by the initial sale of tickets. Thus, Fair did not receive its rightful cut of the revenues because it only received 25% of the funds from tickets *actually used* – not from tickets actually *sold*. Fair's entire argument is based on the deposition testimony of Jeremy Floyd. Jeremy Floyd testified that patrons paid for tickets in cash and that ticket weights were used to create the "Cedar City Amusement Ride Receipts Spot Breakdown

9

Report," which chronicled how many rides Show provided. From these innocuous statements, Fair makes a speculative leap that Show is engaging in a nefarious bait-and-switch practice to bilk money in contravention of the Contract.

Significantly, Fair's theory is directly belied by its 30(b)(6) deponent, who testified that Show paid all of the receipts, fees, and revenues required under the Contract:[3]

> Q. If you want to look back at the contract, sir, "Distribution of Receipts," paragraph 6. Do you have any reason to believe that the Cumberland Valley Shows, Mr. Floyd's company here, didn't live up to the expectations of paragraph 6 or its performance obligation?
>
> A. No.
>
> Q. So it paid its 25 percent of the ride receipts, right?
>
> A. Yes.
>
> ….
>
> Q. So you received this settlement sheet?
>
> A Yes.
>
> ….
>
> Q. And you signed it as accepting it as evidence of full payment and satisfaction of the obligations for 2009 under the contract…?
>
> A. Yes.

(Fair 30(b)(6) Dep. at p. 28:25-30:11). In contrast to Fair, Show provided competent evidence that it complied with the Contract. Specifically, by way of affidavit, Show's office manager stated that Show "kept track of each ticket sold at the 2009 Bartholomew County 4-H Fair and calculated its payments to [Fair] based on the number of tickets sold, not the number of tickets used."

---

[3] It is worth noting that Fair's entire theory is premised on the notion that fair-goers do not use the tickets they buy. Common sense suggests that although this may occasionally happen – after all, some fair-goers may need to leave early after being jostled around the tilt-a-whirl, having a bad experience in the kissing booth, or eating too many funnel cakes –it probably does not occur with regularity.

### E. Fair's Breach

Perhaps ironically, Section 12 – one of the provisions that Fair pointed to in attempt to extricate itself from the Contract – unambiguously establishes that Fair breached the Contract by entering the Burton Agreement. Once again, Section 12 provides, "[i]f for any reason Cumberland Valley Shows ceases to operate this contract becomes void and <u>Fair is open to negotiate freely with other parties</u>." (Emphasis added.) This provision establishes that Show enjoyed an *exclusive right* to provide carnival services to Fair. Moreover, Fair's 30(b)(6) designee confirmed Show's right to exclusivity.

> Q:  And you agree that [the Contract] provides [Show], Mr. Floyd's company, a five-year <u>exclusive</u> provision of those Services?
>
> A:  That's the way the contract reads.

(Fair 30(b)(6) Dep. at p. 21:11-14) (emphasis added). The designee also confirmed that in 2010, "Mr. Floyd's company" was not permitted to "play" the 2010 fair due to the Burton Agreement. (Fair 30(b)(6) Dep. at p. 84:8-13). Under Indiana law, a contract of a definite term – in this case, five years – is not terminable at will without cause or without a mutual agreement between the parties. *See, e.g., Watson v. Fernandez Racing, LLC*, 2005 WL 78969, at *5 (S.D. Ind. Jan. 12, 2005). In sum, the Court is convinced that Fair – and only Fair – breached the Contract.[4]

## IV. CONCLUSION

For the reasons set forth above, Show's Motion for Summary Judgment (Dkt. 49) is **GRANTED** and Fair's Motion for Summary Judgment (Dkt. 52) is **DENIED**.

---

[4] All in all, even if there were defects in Show's performance, those defects were minor, not *material*, and summary judgment in Show's favor would still be warranted. *See, e.g., Wilson v. Lincoln Federal Savings Bank*, 790 N.E.2d 1042, 1048-49 (Ind. Ct. App. 2003) (spelling our factors that determine whether breach is material and affirming trial court's decision to grant summary judgment; "if the failure to perform…is not sufficiently material, the injured party is not discharged or excused, but retains his duty to perform."). Using the factors articulated in *Wilson*, and drawing all inferences in favor of Fair, no reasonable juror could find that Show committed a material breach. Thus, Fair retained its duty to perform, which it clearly did not do. Tellingly, Fair's 30(b)(6) designee conceded that Fair "had not suffered any financial loss as to its relationship with Mr. Floyd's company." (Fair 30(b)(6) Dep. at p. 47:9-13).

SO ORDERED.

Date: 04/20/2011

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Carl W. Butler
FROST BROWN TODD LLC
cbutler@fbtlaw.com, sking@fbtlaw.com

George Terrence Coriden
CORIDEN LAW OFFICE
tcoriden@coriden.com, mmcdonald@coriden.com, crice@coriden.com

Timothy Patrick Coriden
CORIDEN LAW OFFICES
timothyp@coriden.com, crice@coriden.com

Joshua B. Fleming
FROST BROWN TODD LLC
jfleming@fbtlaw.com, kgoletz@fbtlaw.com

Michael T. McNally
DELK MCNALLY
mcnally@delkmcnally.com, braun@delkmcnally.com

Bryce A. Wagner
CORIDEN CORIDEN ANDREWS & GLOVER LLC
bwagner@coriden.com, mmcdonald@coriden.com